No. 2024-2293

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

DISTRICT OF COLUMBIA WATER AND SEWER AUTHORITY,
PLAINTIFF-APPELLEE,

v.

UNITED STATES,
DEFENDANT-APPELLANT.

ON APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS
(Judge Philip S. Hadji, No. 1:18-CV-01586-PSH)

**CORRECTED BRIEF OF THE D.C. DEPARTMENT OF ENERGY AND ENVIRONMENT AS AMICUS CURIAE IN SUPPORT OF APPELLEE THE D.C. WATER AND SEWER AUTHORITY AND IN SUPPORT OF AFFIRMANCE**

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

GRAHAM E. PHILLIPS
Deputy Solicitor General

CHLOE Q. PAN
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6647
graham.phillips@dc.gov

**FORM 9. Certificate of Interest** **Form 9 (p. 1)**
**March 2023**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2024-2293

**Short Case Caption** D.C. Water and Sewer Authority v. United States

**Filing Party/Entity** D.C. Department of Energy and Environment

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/05/2025

Signature: /s/ Graham E. Phillips

Name: Graham E. Phillips

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☑ None/Not Applicable |
| D.C. Department of Energy and Environment | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☐ No ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF AMICUS CURIAE ....1

STATEMENT OF FACTS ....2

SUMMARY OF ARGUMENT ....4

ARGUMENT ....5

I. Congress Enacted The Public Works Act Of 1954 To Create A Comprehensive Funding Scheme For The District's Water And Sewer Infrastructure, Administered Today By D.C. Water. ....5

II. Congress's Sweeping Language In The Act And Its Broad Purpose Require AFRH To Pay For Sewer Services, And The Sole Exception In The Water-Fee Provision Does Not Apply. ....9

A. The exception in the federal water-fees provision does not apply to sewer fees. ....9

B. Alternatively, the narrow exception for water and water services for the maintenance, operation, and extension of the water system does not apply to AFRH's direct use of water and sewer services. ....11

III. The District May Enforce The Public Works Act's Plain Terms Prospectively. ....19

A. The District cannot and did not "waive" its enforcement duties under the Act. ....19

B. The District cannot be equitably estopped from enforcing the Act. ....25

CONCLUSION ....30

## TABLE OF AUTHORITIES

*Cases*

*A.H. Phillips, Inc. v. Walling*,
324 U.S. 490 (1945) ... 16

*Balt. Nat'l Bank v. State Tax Comm'n of Md.*,
297 U.S. 209 (1936) ... 11

*Berghuis v. Thompkins*,
560 U.S. 370 (2010) ... 23

*D.C. Water & Sewer Auth. v. United States*,
156 Fed. Cl. 20 (2021) ... 2, 3, 5, 6, 7, 18

*D.C. Water & Sewer Auth. v. United States*,
No. 18-cv-1586, 2024 WL 3296347
(Fed. Cl. July 3, 2024) ... 3, 4, 10, 12, 16, 17

*District of Columbia v. John R. Thompson Co.*,
346 U.S. 100 (1953) ... 19, 20

*Est. of Akin v. United States*,
31 Fed. Cl. 89 (1994) ... 25, 26

*Freytag v. Comm'r of Internal Revenue*,
501 U.S. 868 (1991) ... 15

*Graham v. Sec. & Exch. Comm'n*,
222 F.3d 994 (D.C. Cir. 2000) ... 28

*Hardt v. Reliance Standard Life Ins. Co.*,
560 U.S. 242 (2010) ... 9

*Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*,
467 U.S. 51 (1984) ... 25, 26

*Henry v. United States*,
870 F.2d 634 (Fed. Cir. 1989) ... 28

*Immigr. & Naturalization Serv. v. Cardoza-Fonseca*,
480 U.S. 421 (1987)........................................................................ 15

*Jarrolt v. Moberly*,
103 U.S. 580 (1880)........................................................................ 18

*Jubilee Housing, Inc. v. D.C. Water & Sewer Auth.*,
774 A.2d 281 (D.C. 2001) .................................................................. 8

*Louisville & N. R. Co. v. United States*,
282 U.S. 740 (1931)........................................................................ 20

*Manor Care Inc. v. United States*,
630 F.3d 1377 (Fed. Cir. 2011) .......................................................... 29

*Morgan v. Sundance, Inc.*,
596 U.S. 411 (2022).................................................................... 22, 24

*Muldrow v. City of St. Louis*,
601 U.S. 346 (2024)........................................................................ 14

*New York v. Hill*,
528 U.S. 110 (2000)........................................................................ 23

*Off. of Pers. Mgmt. v. Richmond*,
496 U.S. 414 (1990)........................................................................ 25

*Ortiz-Pinero v. Rivera-Arroyo*,
84 F.3d 7 (1st Cir. 1996).................................................................. 26

*Peter v. Nantkwest, Inc.*,
589 U.S. 23 (2019).......................................................................... 11

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
572 U.S. 663 (2014)........................................................................ 26

*Phila. Energy Sols. Refining & Mktg., LLC v. United States*,
89 F.4th 1364 (Fed. Cir. 2024) .......................................................... 14

*Shutte v. Thompson*,
82 U.S. 151 (1872).......................................................................... 20

*Small v. United States*,
544 U.S. 385 (2005) .......... 12

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004) .......... 29

*SUFI Network Servs., Inc. v. United States*,
755 F.3d 1305 (Fed. Cir. 2014) .......... 27

*Taylor v. McDonough*,
71 F.4th 909 (Fed. Cir. 2023) .......... 27

*Textron Lycoming Reciprocating Engine Div., Avco Corp. v. United Auto., Aerospace & Agric. Implement Workers of Am.*,
523 U.S. 653 (1998) .......... 13, 14

*United States v. 60 28-Capsule Bottles*,
211 F. Supp. 207 (D.N.J. 1962) .......... 23

*United States v. Amoco Oil Co.*,
580 F. Supp. 1042 (W.D. Mo. 1984) .......... 21

*United States v. Gonzales*,
520 U.S. 1 (1997) .......... 11, 12

*United States v. Honeywell Intern., Inc.*,
841 F. Supp. 2d 112 (D.D.C. 2012) .......... 21, 22

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950) .......... 20

*United States v. S. Ind. Gas & Elec. Co.*,
2003 WL 446280 (S.D. Ind. Feb. 18, 2003) .......... 21

*United States v. Stewart*,
311 U.S. 60 (1940) .......... 22

*United States v. Undetermined Quantities of Clear Plastic Bags*,
963 F. Supp. 641 (S.D. Ohio 1997) .......... 23

*U.S. Parole Comm'n v. Noble*,
693 A.2d 1084 (D.C. 1997) .......... 22

*Warner-Lambert Co. v. Apotex Corp.*,
316 F.3d 1348 (Fed. Cir. 2003) .......... 15

*Westfed Holdings, Inc. v. United States*,
407 F.3d 1352 (Fed. Cir. 2005) .......... 22

*Wharf, Inc. v. D.C. Wharf Horizontal Reit Leaseholder*,
2021 WL 1198143 (D.D.C. Mar. 30, 2021) .......... 26

*Zacharin v. United States*,
213 F.3d 1366 (Fed. Cir. 2000) .......... 27

*Constitutional Provisions*

U.S. Const. art. I, § 8, cl. 17 .......... 24

*Statutes*

D.C. Code § 8-151.02 .......... 1

D.C. Code § 8-152.01 .......... 1

D.C. Code § 34-2101 .......... 2

D.C. Code § 34-2102 .......... 9

D.C. Code § 34-2111 .......... 17

D.C. Code § 34-2112 .......... 8, 9, 10, 19

D.C. Code § 34-2202.16 .......... 2

D.C. Code § 34-2401.25 .......... 3, 10, 12, 15, 19

*Legislative History*

H.R. Rep. No. 83-1358 (1954) .......... 5, 7, 8, 17

Letter from Rowland Hughes, Ass. Dir., Exec. Off. of the President to Samuel Spencer, President, Bd. Of Comm'rs of the District of Columbia (July 30, 1953) .......... 7

*Public Works Construction for the District of Columbia: Hearings on H.R. 7389 Before the J. Subcomm. on Fiscal Affs. of the H. & S. Comms. on the District of Columbia*, 83rd Cong. (1954).......... 5, 6, 17

Report of the Citizens' Advisory Committee on Public Works for the District of Columbia (1952) ..........5, 6

*Other Authorities*

Appl. for Stay of Inj., *United States v. Shilling*, No. 24A1030 (U.S. Apr. 24, 2025).......... 25

Appellee Br., *Morris Commc'ns Inc. v. Fed. Commc'ns Comm'n*, 566 F.3d 184 (D.C. Cir. 2009) (No. 08-1080).......... 28

Br. for the United States as Amicus Curiae, *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014) (No. 12-1315).......... 27

D.C. Water, Proposed FY 2026 Budget (2025), https://tinyurl.com/57vn7rbk .......... 9

Pl.'s Suppl. Br., Ex. B, *D.C. Water & Sewer Auth. v. United States*, 2024 WL 3296347 (Fed. Cl. July 3, 2024) (No. 18-cv-1586).......... 13

Webster's Collegiate Dictionary (5th ed. 1936) .......... 10, 13

## INTRODUCTION AND INTEREST OF AMICUS CURIAE

In 1954, Congress enacted the District of Columbia Public Works Act to establish comprehensive funding for the District's water and sewer infrastructure. Through the Act, Congress fundamentally restructured the United States' payment obligations to the District by mandating that the federal government—which up to that point had routinely short-changed the District—be charged like any other consumer for water and sewer services. Accordingly, the Act granted the District enforcement authority to collect water and sewer fees from all federal entities.

The District of Columbia Department of Energy and Environment (DOEE) submits this brief under Federal Rule of Appellate Procedure 29(a)(2) in support of appellee the District of Columbia Water and Sewer Authority (D.C. Water) and its statutory authority to collect sanitary sewer service charges from the Armed Forces Retirement Home (AFRH), an independent federal agency. DOEE "protect[s] human health and the environment in accordance with District and federal law and regulation," D.C. Code § 8-151.02, and administers the Municipal Separate Storm Sewer System, which serves two-thirds of the District, *id.* § 8-152.01. As DOEE knows, sewer fees are essential for maintaining the District's sewer infrastructure. AFRH should be required to pay its fair share, and the 1954 Act's plain text, history, and purpose confirm this conclusion. Moreover, the District cannot be precluded

from enforcing this statutory mandate, passed by Congress and applicable to the federal government, simply because the District did not enforce it in prior years.

## STATEMENT OF FACTS

D.C. Water bills consumers on behalf of the District for various fees that cover water and sewer usage. D.C. Code § 34-2202.16(a). This appeal specifically concerns sanitary sewer service charges, which cover the cost of services furnished by the District's "sewers, appurtenances, pumping stations, and treatment works for conveying, treating, and disposing" waste and used water. *Id.* § 34-2101(8). The United States, on behalf of AFRH, contends that a 1938 agreement between the District and AFRH granted the Home free sewer services in perpetuity in exchange for the construction of a reservoir on the Home's property, notwithstanding the 1954 Act's mandate that all federal entities pay sewer fees. On appeal, the United States challenges two Court of Federal Claims decisions requiring AFRH to pay D.C. Water for sewer fees for fiscal year 2021.

1. The first opinion granted partial summary judgment to D.C. Water. *D.C. Water & Sewer Auth. v. United States*, 156 Fed. Cl. 20 (2021) (Horn, J.). The trial court determined that the 1954 Act's plain language had "express, catchall instructions" that created "a mandatory obligation for federal entities within the District, including the AFRH, to pay for sanitary sewer services." *Id.* at 52-53. As the court explained, "even if the 1938 Agreement could be read to include the

District's providing sanitary sewer services without the AFRH having to pay, the 1938 agreement was always going to be subject to potential, subsequently enacted legislation by Congress concerning the obligations of the United States related to sewer charges by the District." *Id.* at 53. Moreover, this reading of the 1954 Act did not render the 1938 agreement "illusory" because the reservoir provided "a direct benefit to the United States" by not subjecting them to "an inadequately constructed and operated water supply system." *Id.* at 54. Thus, the District was entitled to damages from the United States for fiscal year 2021.[1] *Id.*

2. The second opinion awarded $633,150.91 in damages to D.C. Water. *D.C. Water & Sewer Auth. v. United States*, No. 18-cv-1586, 2024 WL 3296347 (Fed. Cl. July 3, 2024) (Hadji, J.). The trial court decided two additional merits questions related to the exceptions clause in D.C. Code § 34-2401.25, which excludes charges for "water and water services furnished to the United States for the maintenance, operation, and extension of the water system." First, it held that this exception governs water *and* sewer charges. *Id.* at *5. Second, it determined that AFRH's prior agreement did not qualify. *Id.* Applying statutory interpretation canons, the court explained that the exception covers "isolated and limited" water uses like flow-

[1] The court determined that the District is not entitled to payment from before fiscal year 2021 because the District had failed to comply with certain procedural requirements in the Act. *Id.* at 66-67.

testing or periodic flushing. *Id.* at *6. Furthermore, "Congress knew how [to], and did, recognize exemptions in other sections of the 1954 Act," but did not mention AFRH or the 1938 agreement. *Id.* at *5. The court concluded that it "goes too far" to say that the statute "exempts an entire Government agency or organization from charges relating to all water and water services in perpetuity through a bargained-for exchange." *Id.* at *6.

## SUMMARY OF ARGUMENT

The judgments below correctly held that D.C. Water is entitled to sewer fees from AFRH. *First*, the history and purpose of the Public Works Act of 1954 confirm that Congress intended to overhaul the District's infrastructure funding scheme by ensuring that the federal government pays its fair share of fees. *Second*, consistent with that purpose, the Act's plain text is sweeping: its payment mandate broadly extends to all federal government water and sewer use, with only a limited exception for water used for infrastructure upkeep. For that reason, AFRH is obligated to pay sewer fees, whether because the narrow water exception does not apply to *sewer* fees, or because that exception does not apply to the facts of this case. *Third*, the United States' "waiver" and "estoppel" arguments lack any merit. The District's enforcement mandate arises from statute, not by contract. Even assuming waiver or estoppel could apply to a government entity like the District, neither theory can preclude the District from enforcing a statute enacted by Congress.

# ARGUMENT

## I. Congress Enacted The Public Works Act Of 1954 To Create A Comprehensive Funding Scheme For The District's Water And Sewer Infrastructure, Administered Today By D.C. Water.

1. Congress enacted the Public Works Act of 1954 to address the dire state of the District's public works infrastructure. H.R. Rep. No. 83-1358, at 2-3 (1954). This infrastructure scheme was originally designed by the federal government: in 1889, under authority granted by Congress, President Harrison appointed engineers to study and develop the District's sewer system. *Public Works Construction for the District of Columbia: Hearings on H.R. 7389 Before the J. Subcomm. on Fiscal Affs. of the H. & S. Comms. on the District of Columbia*, 83rd Cong. 78 (1954) (hereinafter *Public Works Act Hearings*). The following year, the federal government adopted the engineers' proposed sewer plan, which was designed to serve 500,000 residents. *Id.*; Report of the Citizens' Advisory Committee on Public Works for the District of Columbia 65 (1952). But that system reached capacity in the early 1920s. Report at 65.

By 1952, the District's sewer infrastructure was in a "disturbing" condition. *Id.* Insufficient funding had prevented the system from developing to meet the demands of the District's rapidly growing population, which exceeded one million people. *Id.* The system's users, who did not pay any sewer fees, were free-riding on "large-scale investments of the past." *Id.* at 66. Notably, much of the financial

deficit for long-overdue improvements was directly attributable to the District's status as the seat of the federal government. *Public Works Act Hearings* at 415 (statement of Robert V. Fleming, Chairman, Subcomm. on Fin. of the Citizens Advisory Comm. on Pub. Works). At the time, the federal government occupied over 40% of District land but contributed nothing to the sewer system's upkeep. *Id.* To address this crisis, Congress determined that a "sewage service charge" assessed to customers, including the federal government, was the only way to sustainably fund the District's sewer infrastructure. Report at 66-67.

Accordingly, the proposed Public Works Act fundamentally restructured the relationship between the federal government and the District in terms of water and sewer charges. The Act contemplated "[f]ull payment by the United States Government" with an emphasis on mandating that the "United States pay the full value" of services it received from the District. *Public Works Act Hearings* at 39 (statement of David V. Auld, Director, Dep't of Sanitary Eng'g). The word "value" was important. Congress knew that federal lump-sum appropriations routinely fell short of the real cost of services. *Id.* at 37-39. For example, in fiscal year 1948, the federal government appropriated a $1 million payment for water while the *actual* value of services used was $1,118,258. *Id.* at 39. Put in 2025 dollars, the United States by 1953 skirted an annual water bill of approximately $4 million. *See id.* at 39.

On top of short-changing water payments, federal facilities annually generated 10 billion gallons of sewage—all of which needed to be collected and treated by the District's sewer system before being discharged into the Potomac River. *Id.* at 98. These costly services were entirely shouldered by the District. *Id.*; *see id.* at 707 (statement of John H. Connaughton, Del. from Petworth Citizens Ass'n, Inc. to the Fed'n of Citizens Ass'ns of the District of Columbia) ("The Federal Government owns almost half the area of D.C. . . . and yet does not even pay the full cost of the water it uses and contributes nothing to the sewer cost.").

Congress noted that the Bureau of Budget within the Executive Office of the President (the predecessor to the Office of Management and Budget) supported the proposed funding model, which would charge the federal government as an ordinary customer. H.R. Rep. No. 83-1358, at 3. The Bureau recognized "the desirability of a more adequate and comprehensive public works program" and had no objections to "the higher proposed payment for water and sewer services furnished [to] the Federal Government." Letter from Rowland Hughes, Ass. Dir., Exec. Off. of the President to Samuel Spencer, President, Bd. of Comm'rs of the District of Columbia (July 30, 1953). Congress further acknowledged President Eisenhower's strong support for "plac[ing] Federal payments to the District government on a level commensurate with the Federal government's position in and its demands upon the District." H.R. Rep. No. 83-1358, at 2.

Thus, the Public Works Act established that water and sanitary sewer services "would be sustained by revenues provided by users of the services" rather than ever-increasing annual appropriations. *Id.* The House Report made clear that sanitary sewer service charges "would be paid by all persons discharging sewage into the sanitary sewage system of the District, including the United States Government." *Id.* at 3. These charges would "pay the entire expense of constructing, maintaining, replacing, and operating the sanitary sewer system." *Id.* In short, this user-based funding model would allow the District's sewer infrastructure to be "financially self-supporting." *Id.* And charging sewer consumers—including the federal government—based on usage brought the District in line with prevailing practices in 250 municipalities throughout the country. *Id.*

2. D.C. Water was created in 1996 "[d]ue to maintenance requirements, financial concerns, federal mandates, and customer demands within the District and the affected Metropolitan area jurisdictions." *Jubilee Housing, Inc. v. D.C. Water & Sewer Auth.*, 774 A.2d 281, 286 (D.C. 2001) (Reid, J. dissenting). The D.C. Council envisioned that the agency would "enhance the financial viability of water distribution and sewage collection, treatment, and disposal systems in the District and enhance the District's ability to meet its statutory obligation to provide sanitary sewer services to the surrounding jurisdictions." *Id.*

Today, D.C. Water is responsible for the District's sanitary sewer system, which spans across 2,000 miles of sewers, 50,000 manholes, and nine wastewater pumping stations. D.C. Water, Proposed FY 2026 Budget 10 (2025), https://tinyurl.com/57vn7rbk. D.C. Water also oversees the Blue Plains Advanced Wastewater Treatment Plant, which treats approximately 320 million gallons of wastewater per day. *Id*. As DOEE knows, consumer fees sustain critical infrastructure by funding the "construction, operation, maintenance, expansion, relocation, replacement, renovation, and repair" of the District's sewer works. D.C. § 34-2102(1).

## II. Congress's Sweeping Language In The Act And Its Broad Purpose Require AFRH To Pay For Sewer Services, And The Sole Exception In The Water-Fee Provision Does Not Apply.

### A. The exception in the federal water-fees provision does not apply to sewer fees.

Statutory interpretation must begin with a statute's plain text, "assum[ing] that the ordinary meaning of that language accurately expresses the legislative purpose." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010) (brackets in original) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009)). As enacted by Congress through the 1954 Act, the federal sewer fees mandate broadly establishes that sanitary sewer service charges

> shall be applicable to *all* sanitary sewer services furnished by the sanitary sewage works of the District through *any* connection thereto

> for direct use by the government of the United States or *any* department, independent establishment, or agency thereof.

D.C. Code § 34-2112(a) (emphasis added). This sewer provision contains no exceptions. The only caveat is that sewer charges "shall be predicated on the value of water and water services received by" federal facilities "from the District water supply system." *Id.*

To determine the meaning of that caveat, the trial court looked to the federal water fees mandate, which separately establishes water and water services charges:

> *All* water and water services furnished from the District water supply system through *any* connection thereto for direct use by the government of the United States or *any* department, independent establishment, or agency thereof, situated in the District, except water and water services furnished to the United States for the maintenance, operation, and extension of the water system, shall be paid for at the rates . . . applicable to other water consumers in the District.

*Id.* § 34-2401.25(a) (emphasis added); *D.C. Water*, 2024 WL 3286347, at *3. The trial court held that the *water* provision's exceptions clause (for the maintenance, operation, and extension of the water system) also governs *sewer* fees. *D.C. Water*, 2024 WL 3286347, at *5. But as D.C. Water explains in greater detail, *see* D.C. Water Br. 17-22, this is not the best reading of the statute.

To be sure, Congress established that sewer charges "shall be predicated on the *value* of water and water services received by such facilities." D.C. Code § 34-2112(a) (emphasis added). But "value" simply means "[m]onetary worth," *Value*, Webster's Collegiate Dictionary 1105 (5th ed. 1936), and there is monetary

worth to water and water services even if a statutory exemption precludes an agency's obligation to pay for them. If Congress intended for sewer charges to have the same exception, it could have included that exception in the sewer provision or mandated that sewer charges be calculated *in the same manner* as water charges. It did not. Instead, the federal sewer fees mandate was worded to ensure that the federal government foots the full monetary worth of sewer services it consumes, keyed to the *value* of water and water services provided. There is no indication that Congress intended to create a loophole allowing a federal agency to skirt its entire sewer bill. This is reason enough to affirm.

### B. Alternatively, the narrow exception for water and water services for the maintenance, operation, and extension of the water system does not apply to AFRH's direct use of water and sewer services.

Assuming the federal water fees mandate—with its exception—controls the calculation of sewer fees, that narrow exception does not extend to AFRH's entire sewer bill. As a threshold matter, both the water and sewer fee-mandating provisions use broad language and apply whenever the federal government uses the District's water and sewer services. The word "all" indicates "uncompromising generality." *Balt. Nat'l Bank v. State Tax Comm'n of Md.*, 297 U.S. 209, 212 (1936); *see Peter v. Nantkwest, Inc.*, 589 U.S. 23, 31 (2019) ("all" conveys "breadth"). Similarly, the word "any" has an "expansive meaning"; it refers to "one or some indiscriminately of whatever kind." *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting

Webster's Third New International Dictionary 97 (1976)); *see Small v. United States*, 544 U.S. 385, 396 (2005) (Thomas, J., dissenting) (collecting cases holding the same).

The United States does not dispute that the water provision's principal clause would require AFRH to pay water (and sewer) charges. Moreover, as the lower court explained, "nowhere in the statute is AFRH (including any of its predecessors-in-interest) or the 1938 Agreement mentioned or even alluded to." *D.C. Water*, 2024 WL 3296347, at *5. Nevertheless, the United States asserts that the 1938 agreement's contractual provision granting free water and water services to AFRH fits within the sole exception for water and water services furnished "for the maintenance, operation, and extension of the water system." D.C. Code § 34-2401.25(a). But the statute's plain text, structure, and context confirm that the exception does not extend to AFRH.

First, the plain text: the federal water fees mandate distinguishes between two types of water and water services—services "for direct use" by a federal agency on one hand, and services "for the maintenance, operation, and extension of the water system" on the other. This parallel structure indicates that whether fees apply depends on who initiates the water usage. If the federal government turns on the faucet "for [its] direct use," it is charged. By contrast, if *D.C. Water* turns on the faucet "for the maintenance, operation, and extension of the water system," the

federal government is not charged. For instance, the United States (or any other customer) would not be billed for water used for flow testing because that is the *District*'s direct use, not the federal government's. Likewise, where a new building requires new pipelines, post-construction flushing "for the maintenance, operation, and extension of the water system" would not be billed to the United States. *See* Pl.'s Suppl. Br., Ex. B at 2, *D.C. Water*, 2024 WL 3296347, ECF No. 145-2.[2]

That understanding of the exception comports with the ordinary meaning of the word "for" in this statutory scheme. Although the preposition has many definitions, only one makes sense in this context: "for" is a functional word that "indicat[es] the end" to which water itself is used. *For*, Webster's Collegiate Dictionary 390 (5th ed. 1936); *see Textron Lycoming Reciprocating Engine Div., Avco Corp. v. United Auto., Aerospace & Agric. Implement Workers of Am.*, 523 U.S. 653, 657 (1998) (noting the "fundamental principle of statutory construction . . . that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used"). "For" in "for direct use" obviously denotes the federal government's physical use of the water itself. By the

---

[2] As D.C. Water explains in its brief as another basis for affirmance, the reservoir built on AFRH's property does not fall within the meaning of "extension of the water system"—the only portion of the exception clause that the United States says applies here—because the reservoir did not expand the water system into a previously unserved area. D.C. Water Br. 4-16.

same token, "for" in "for the maintenance, operation, and extension of the water system" means water service for *those* physical uses, as opposed to "direct use" by the federal government. This definition of "for" follows this Court's presumption that identical words used in a statute have the same meaning. *See Phila. Energy Sols. Refining & Mktg., LLC v. United States*, 89 F.4th 1364, 1369 (Fed. Cir. 2024).

By contrast, the exceptions clause "cannot possibly bear the meaning ascribed to it by the Government." *Textron*, 623 U.S. at 657. According to the United States, AFRH receives water and water services "for facilitating the construction of a high-elevation water reservoir." U.S. Br. 24. Thus, according to the federal government, "for the extension of the water system" actually means "*in exchange* for *an easement to allow* the extension of the water system." But the Court should not "'add words to the law' to achieve what [the United States] might think 'a desirable result.'" *Muldrow v. City of St. Louis*, 601 U.S. 346, 358 (2024) (quoting *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015)). Moreover, no reasonable interpreter would think "for direct use" means water and water services *in exchange for an easement to permit* the direct use of water. The government does not explain how its definition of the exception clause accounts for the statute's parallel use of "for" in the phrase "for direct use."

D.C. Water's reading is bolstered by the differences in language between the water provision's principal clause and exceptions clause. While Congress used the

expansive terms "all" and "any" to broadly define the federal water uses subject to fees, it conspicuously omitted that language from the exceptions clause. Instead, Congress used the definite article "the" before "maintenance, operation, and extension." D.C. Code § 34-2401.25(a). "[I]t is a rule of law well established that the definite article 'the' particularizes the subject which it precedes. It is a word of limitation.'" *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1356 (Fed. Cir. 2003) (quoting *Am. Bus Ass'n v. Slater*, 231 F.3d 1, 4-5 (D.C. Cir. 2000)); *see Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 902 (1991) (Scalia, J. concurring in part) (explaining that using "the," in contrast with "any," "obviously narrows" the envisioned class). "The contrast between the language used in the two standards . . . indicate[s] that Congress intended the two standards to differ." *Immigr. & Naturalization Serv. v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987). While Congress intended the federal government to pay for *all* water services to *any* agency, it exempted only water services for *the* maintenance, operation, and extension of the water system, a narrow exception for water uses like flow-testing or flushing.

Indeed, the federal government's interpretation of the exceptions clause would be astonishing to any lay reader. According to the United States, when Congress passed the 1954 Act, it included within the limited phrase "for the maintenance, operation, and extension of the water system" a perpetual carveout

from paying any water (or sewer) fees for an entire federal agency. And it did this, the federal government claims, without any reference to that agency in the statute, let alone any clear intent that the agency be forever exempt from paying for sewer services it uses. The trial court correctly concluded that the United States' interpretation "runs afoul of the general maxim that Congress does not 'hide elephants in mouseholes.'" *D.C. Water*, 2024 WL 3296347, at *5 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)); *see A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) ("To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people.").

The history and purpose of the Public Works Act confirm that the statutory text means what it says. The United States offers no meaningful discussion of the Act beyond a cursory note that the statute "established a comprehensive public works system for the District." U.S. Br. 6. But this only scratches the surface. As discussed, *see supra* pp. 5-9, Congress passed the Act to establish a funding scheme for the District's water and sewer infrastructure that explicitly requires the federal government to pay its fair share of fees. Both the legislative and executive branches of the federal government endorsed this approach. Contrary to the United States' assertion that "[t]here would be no reason why Congress would have intended to

narrow" the exceptions clause, U.S. Br. 27, the Act's history and purpose point in the opposite direction.

In fact, the Soldiers' Home (as AFRH was then known) was referenced throughout congressional hearings on the Public Works Act. *See, e.g.*, *Public Works Act Hearings* at 77, 127, 238. But despite acknowledging the Home, at no point did Congress suggest that AFRH should be excluded from paying fees. By contrast, Congress considered exemptions for "churches and charitable organizations." *Id.* at 95. As the trial court recognized, these exemptions were ultimately incorporated into the Act and codified at D.C. Code § 34-2111. *D.C. Water*, 2024 WL 3296347, at *5. No similar exception (or even discussion of an exception) exists for AFRH—or any other federal entity, for that matter. Nor is there any indication that Congress intended to create a unique carveout for bargained-for agreements between the District and the United States from decades prior.

This reading comports with the goal of the funding structure created by the Public Works Act. The Act contemplated that user-based fees would "pay the entire expense of constructing, maintaining, replacing, and operating the sanitary sewer system." H.R. Rep. No. 83-1358, at 3. As a result, the "operation, maintenance, repair and expansion of all sanitary and sewage treatment works would be a financially self-supporting activity." *Id.* In other words, fees for consumers' direct use would cover the cost of system upkeep. It follows that the exceptions clause was

meant to prevent charging consumers for the *District*'s system-related water uses—not to create a special exemption for AFRH. In short, the United States' interpretation contravenes the Act's clear language and "defeat[s] its evident purpose." *Jarrolt v. Moberly*, 103 U.S. 580, 586 (1880).

Finally, the United States is simply wrong that requiring AFRH to pay sewer fees would "void the very instrument by which the District continues to operate a water reservoir." U.S. Br. 27. The 1954 Act's sole impact on the 1938 agreement was to override, by statute, the contractual provision providing AFRH with "free water and water services." The rest of the agreement remains in effect. Indeed, the United States has not challenged the trial court's determination that building the reservoir conferred benefits to the federal government beyond just "free water." *See D.C. Water*, 156 Fed. Cl. at 54. For instance, the agreement explains that AFRH enjoys "the advantage of having a more continuous pressure for fire fighting purposes in the protection of the buildings and property of said Home resulting from the installation of the proposed reservoir," which "constitute[s] a lasting benefit to said Home" and is part of the "adequate consideration" for building the reservoir. App. 9. This benefit—which the United States acknowledges nowhere in its brief—persists after the 1954 Act. There is no reason to treat the Act as voiding the *entire* 1938 agreement rather than simply doing what the statute says: requiring AFRH to pay water and sewer fees like every other federal agency.

## III. The District May Enforce The Public Works Act's Plain Terms Prospectively.

### A. The District cannot and did not "waive" its enforcement duties under the Act.

The United States alternatively argues that the District has "waived" its ability to collect sewer fees by not doing so for several decades. U.S. Br. 28-31. Not only is that wrong, but it is antithetical to the District's *and the United States'* interests.

*First*, properly understood, D.C. Water's authority to collect sewer fees is an enforcement mandate enacted by Congress under the Public Works Act, not a contractual right that can be waived. The Supreme Court has made clear that a government's failure "to enforce a law does not result in its modification or repeal." *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 113-114 (1953). When Congress establishes a statutory mandate, like the requirement that fees "shall be paid," D.C. Code §§ 34-2112, 34-2401.25(a), only Congress may revoke that mandate, *see Thompson*, 346 U.S. at 114. Here, it is undisputed that the District's authority to charge sewer fees—and the federal government's duty to pay them—derive from statute. The United States emphasizes that the Public Works Act is "*the* legislation governing the District's collection of payments for water and sewer services." U.S. Br. 29. And the United States explains that D.C. Water sought to enforce "that 1954 statutory authority" when it sued for sewer fees from AFRH. U.S. Br. 29.

The United States' novel "abandonment" theory, U.S. Br. 29, contravenes longstanding Supreme Court precedent. In *Thompson*, the Court squarely rejected the argument that legislative acts can be "abandoned or repealed as a result of non-use and administrative practice." 346 U.S. at 113. In that case, the District sought to enforce 1872 and 1873 Acts prohibiting racial discrimination. *Id.* at 103. The Court rejected the argument that those laws were "unenforceable" in 1953 just because the District had not enforced them for nearly a century. *Id.* at 113. As the Court explained, a law continues to be valid even when the government "neglects or refuses to enforce a requirement long prescribed by the legislature." *Id.* at 116.

In fact, the Supreme Court has repeatedly sided *with the United States* in concluding that the government cannot forfeit its enforcement authority through inaction. In *Louisville & Nashville R. Co. v. United States*, 282 U.S. 740 (1931), the Court held that the "failure to enforce the law does not change it." *Id.* at 759. And in *United States v. Morton Salt Co.*, 338 U.S. 632 (1950), the Court similarly determined that "unexercised" enforcement powers "are not lost by being allowed to lie dormant." *Id.* at 647. The reason is straightforward: repealing the law is a "legislative function," not an executive one. *Thompson*, 346 U.S. at 114.

Indeed, applying a theory of "waiver" here makes little sense. A party may waive rights that are "intended for [their] benefit," *Shutte v. Thompson*, 82 U.S. 151, 151 (1872), but legislation that grants enforcement authority to the government is

intended to benefit the broader public. Thus, courts have consistently recognized that public officials typically lack the authority to "waive" enforcement in the absence of statutory repeal. *See, e.g.*, *United States v. S. Ind. Gas & Elec. Co.*, No. IP 99-1692, 2003 WL 446280, at *4 (S.D. Ind. Feb. 18, 2003) ("[I]t is doubtful that public officials at [an agency] have any authority to waive a claim under [congressional legislation], which benefits the American populace."); *United States v. Amoco Oil Co.*, 580 F. Supp. 1042, 1050 (W.D. Mo. 1984) ("Nor in my judgment can any defense of waiver be asserted against the government in this kind of situation, since generally speaking public officers have no power or authority to waive the enforcement of the law on behalf of the public.").

Ultimately, there is nothing the District could have done—whether through a Corporation Counsel opinion, a D.C. Council resolution, or a mayoral pronouncement—to "waive" its enforcement mandate under the Public Works Act. Accepting the United States' position could allow the District to "waive" its enforcement of any congressionally-enacted statutory obligations, contravening basic principles of federalism and separation of powers. Unsurprisingly, neither the Supreme Court nor this Court has applied waiver to strip a government of its prospective statutory enforcement authority based solely on prior inaction.

*Second*, even if "waiver" could apply here, the United States has made no showing that the District affirmatively "waived" its enforcement authority under the

Public Works Act. Waiver "is the intentional relinquishment or abandonment of a known right." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 417 (2022). "To decide whether a waiver has occurred, the court focuses on the actions of the person who held the right" and "seldom considers the effects of those actions on the opposing party." *Id.*[3]

The District has never intentionally "waived" its authority to collect sewer fees from AFRH. The United States primarily relies on a 1990 D.C. Department of Public Works (DPW) letter to AFRH, which references "legal advice" provided by the District's "expert government counsel." U.S. Br. 29-30. But though Corporation Counsel opinions can be "enlighten[ing]" or "persuasive," they "are not valid legal authority." *U.S. Parole Comm'n v. Noble*, 693 A.2d 1084, 1102 (D.C. 1997) (internal quotation marks omitted). Moreover, the United States has not identified any District employee—including a DPW director—with the delegated authority "to waive or surrender a public right" like the statutory mandate to collect sewer fees. *United States v. Stewart*, 311 U.S. 60, 70 (1940); *see United States v. Honeywell*

[3] A "waiver" argument is especially ill-suited here because "[w]aiver is an affirmative defense [in contract], as to which the breaching party bears the burden of proof." *Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1360 (Fed. Cir. 2005). By invoking waiver, the United States implies that it breached *an agreement* to pay. But the United States' obligation to pay is imposed by statute, not by contract.

*Intern., Inc.*, 841 F. Supp. 2d 112, 114 (D.D.C. 2012) ("[W]aiver must be made by one having the authority to do so.").

Lacking evidence of affirmative waiver, the United States falls back on the argument that the District "implied[ly]" waived its enforcement authority against AFRH by failing to seek fees for several decades. U.S. Br. 29. But the only precedent that the United States cites for this proposition is *Berghuis v. Thompkins*, 560 U.S. 370 (2010), which involved a defendant's implied waiver of their *Miranda* right to remain silent—a far cry from the "waiver" of a government's statutory authority to collect sewer service fees. *See* U.S. Br. 29. As the Supreme Court has explained, what "suffices for waiver depends on the nature of the right at issue." *New York v. Hill*, 528 U.S. 110, 114 (2000) (listing examples of different waiver standards that apply to different rights). In the context of a government's supposed waiver, courts have repeatedly held that the government must *correct* enforcement lapses, not *abandon* any future enforcement. *See, e.g.*, *United States v. Undetermined Quantities of Clear Plastic Bags*, 963 F. Supp. 641, 646 (S.D. Ohio 1997) (an individual is "not entitled to a waiver" to engage in prohibited acts just because "the government has not enforced the law against it previously"); *United States v. 60 28-Capsule Bottles*, 211 F. Supp. 207, 215 (D.N.J. 1962), *aff'd* 325 F.2d 513 (3d Cir. 1963) (the government has "a duty to change its position" if it "learns that its original position was in error").

Finally, the United States pivots to "prejudice" to AFRH, even though it concedes that "waiver does not turn on whether the other party was 'prejudiced.'" U.S. Br. 30 (citing *Morgan*, 596 U.S. at 417). Indeed, *Morgan* made clear that "the usual federal rule of waiver does not include a prejudice requirement." 596 U.S. at 419. In any event, it makes no sense for the United States to assert "prejudice" here; in doing so, the federal government is pointing fingers at itself. As the United States explains in its brief, "Congress established the Soldiers' Home," U.S. Br. 3, "Congress enacted further legislation that currently governs the Home," U.S. Br. 3, and "Congress approved funding for the construction of the reservoir on the Soldiers' Home's property," U.S. Br. 13. And, most importantly, Congress enacted the Public Works Act and "specifically designed" AFRH's funding structure. U.S. Br. 31.

In short, all roads lead back to Congress. Congress could modify the Public Works Act to exempt AFRH from paying fees. Congress could also adjust AFRH's funding structure. Or Congress could alter the allocation of power and money between AFRH, a federal agency, and the District of Columbia, a federal territory. *See generally* U.S. Const. art. I, § 8, cl. 17. Where Congress has not done so, the United States cannot fault the District for beginning to comply with the statutory scheme that Congress enacted.

### B. The District cannot be equitably estopped from enforcing the Act.

Related to its waiver argument, the United States also asserts that the District should be equitably estopped from enforcing the Act. U.S. Br. 31-33. That too is wrong. Again, accepting that argument would impact not just the District, but also the United States.

*First*, as a threshold matter, equitable estoppel rarely applies against the government. The Supreme Court has long explained "from [its] earliest cases" that "equitable estoppel will not lie against the Government as it lies against private litigants." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 419 (1990). As the United States itself has recently acknowledged, the Court "has 'reversed every finding of estoppel' against the government that it has reviewed." Appl. for Stay of Inj. at 29, *United States v. Shilling*, No. 24A1030 (U.S. Apr. 24, 2025) (quoting *Richmond*, 496 U.S. at 422). In fact, the United States has urged the Supreme Court to adopt the blanket rule that "estoppel may not in *any* circumstances run against the Government." *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60 (1984) (emphasis added). The United States cannot have it both ways—invoking estoppel when convenient here, while elsewhere urging courts to categorically reject estoppel claims against the government. At the least, it "cannot ignore that courts have consistently applied the doctrine of equitable estoppel against the Government 'with the utmost caution and restraint.'" *Est. of Akin v. United States*, 31 Fed. Cl.

89, 96 (1994) (quoting *Boulez v. Comm'r of Internal Revenue*, 76 T.C. 209, 215 (1981), *aff'd*, 810 F.2d 209 (D.C. Cir. 1987)).

This principle does not change just because equitable estoppel is asserted against the District, nor has the United States offered any reason why it should. *See Wharf, Inc. v. D.C. Wharf Horizontal Reit Leaseholder*, No. 15-CV-1198, 2021 WL 1198143, at *32 (D.D.C. Mar. 30, 2021) ("The District of Columbia Court of Appeals has questioned whether 'the doctrine of equitable estoppel' is 'applicable against the [District] government at all.'"). "When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined." *Heckler*, 467 U.S. at 60. This holds true regardless of whether the government actor is the United States or the Congress-created District government. Thus, "application of the equitable estoppel doctrine against governmental entities, including municipalities, is narrowly circumscribed." *Ortiz-Pinero v. Rivera-Arroyo*, 84 F.3d 7, 16 (1st Cir. 1996) (citing *Heckler*, 467 U.S. at 60-62).

Tellingly, the United States does not cite a single case in which equitable estoppel has been applied against a government entity. Instead, it relies solely on *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014), for the general proposition that "[t]he gravamen of estoppel, a defense long recognized as available in actions at law, is misleading and consequent loss." U.S. Br. 31 (quoting *Petrella*,

572 U.S. at 684). But *Petrella* involved a copyright dispute between two *private* litigants, not the government, and it focused on the doctrine of laches. The United States even filed an amicus brief in that case distinguishing laches from estoppel, noting that the latter "generally requires affirmative misbehavior." Br. for the United States as Amicus Curiae at 24 n.4, *Petrella*, 2013 WL 6157113.

*Second*, even if estoppel could be invoked against the District, the United States has failed to meet its heavy burden. Equitable estoppel is "rooted in 'the maxim that no man may take advantage of his own wrong.'" *Taylor v. McDonough*, 71 F.4th 909, 925 (Fed. Cir. 2023) (quoting *Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 232 (1959)). To prevail on an estoppel claim, a party must show: "(1) misleading conduct, which may include not only statements and actions but silence and inaction, leading another to reasonably infer that rights will not be asserted against it; (2) reliance upon this conduct; and (3) due to this reliance, material prejudice if the delayed assertion of such rights is permitted." *SUFI Network Servs., Inc. v. United States*, 755 F.3d 1305, 1325 (Fed. Cir. 2014). Additionally, a party asserting estoppel against the government must show "affirmative misconduct." *Zacharin v. United States*, 213 F.3d 1366, 1371 (Fed. Cir. 2000) (noting that every court of appeals has recognized that "if equitable estoppel is available at all against the government[,] some form of affirmative misconduct must be shown").

Here, the United States' brief does not even mention "affirmative misconduct," let alone offer any theory of how it occurred. This failure is fatal to its estoppel claim. *See Henry v. United States*, 870 F.2d 634, 637 (Fed. Cir. 1989) (finding dispositive the failure to show affirmative misconduct as an element of an estoppel claim against the government). The only potential "misconduct" is the District's failure to collect sewer fees from AFRH. And United States has routinely explained in other cases that enforcement delay or inaction does not amount to affirmative misconduct. *See, e.g.*, Appellee Br. at 46, *Morris Commc'ns Inc. v. Fed. Commc'ns Comm'n*, 566 F.3d 184 (D.C. Cir. 2009) (No. 08-1080) ("courts have consistently held that alleged agency delay does not constitute affirmative misconduct justifying estoppel") (collecting cases); *see also Graham v. Sec. & Exch. Comm'n*, 222 F.3d 994, 1008 & n.26 (D.C. Cir. 2000) (an agency's failure to prosecute at one point does not estop the agency from prosecuting at a later time) (collecting cases).

Nor can the United States satisfy the other estoppel elements of reliance or prejudice. If this Court reaches the estoppel argument, the United States has already lost on the merits and the Public Works Act requires AFRH to pay sewer fees. Far from being harmed, then, the United States has only *benefited* from the District's prior lack of payment enforcement. But just because the federal government received a windfall in the past does not mean that it may rely on that windfall moving

forward. As explained, Congress can always amend the Public Works Act or AFRH's funding structure. Until then, AFRH must pay sewer fees as required by statute.

Indeed, the "implications" of the United States' argument "would be breathtaking." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 736 (2004). The federal government's position means that whenever an agency fails to enforce a statutory mandate, such as an entity's obligation to pay taxes or fees, the agency forever relinquishes that right to collect going forward. Nothing requires that absurd and inequitable result. Instead, "[t]he general rule is that estoppel will not lie against the government because of actions by government agents." *Manor Care Inc. v. United States*, 630 F.3d 1377, 1385 (Fed. Cir. 2011). "Absent statutory or regulatory authority," this Court will not rewrite plain statutory text "in order to accommodate supposed equitable principles." *Id.* at 1386.

## CONCLUSION

This Court should affirm the Court of Federal Claims' judgments.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

/s/ Graham E. Phillips
GRAHAM E. PHILLIPS
Deputy Solicitor General

CHLOE Q. PAN
Assistant Attorney General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6647
graham.phillips@dc.gov

June 2025

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-2293

**Short Case Caption:** D.C. Water and Sewer Authority v. United States

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- ☑ the filing has been prepared using a proportionally-spaced typeface and includes 6,997 words.
- ☐ the filing has been prepared using a monospaced typeface and includes ________ lines of text.
- ☐ the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 06/11/2025

Signature: /s/ Graham E. Phillips

Name: Graham E. Phillips